IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL TAINO, individually and on behalf of those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BOW TIE CINEMAS, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff Michael Taino ("Plaintiff"), individually and on behalf of the class defined below (the "Class"), through his undersigned counsel, brings this Class Action Complaint against Defendant Bow Tie Cinemas LLC ("Bow Tie" or "Defendant").

1. This is a class-action suit brought against Defendant for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA").

2. Bow Tie operates under its trade names "Bow Tie Cinemas" and "BTM Cinemas." Bow Tie touts that it "is a four-generation, family-owned company" that was founded in 1900 by vaudeville impresario B.S. Moss. *See* https://www.linkedin.com/company/bow-tie-cinemas/. According to Bow Tie, the company is "the oldest theater circuit in North America and is America's eighth-largest movie theater chain," operating 377 screens at 58 locations in five states (Colorado, Connecticut, Maryland, New Jersey, New York, and Virginia).

3. Bow Tie owns and operates a website, www.bowtiecinemas.com (the "Bow Tie Website," also accessible at www.btmcinemas.com), where consumers can watch trailers, browse showtimes, and purchase movie tickets.

4. The VPPA protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. The VPPA defines a "video tape service provider" broadly, and under both the plain language of the statute and courts' interpretations of that language, Bow Tie constitutes a "video tape service provider."

5. "Personally identifiable information" ("PII") is defined by the VPPA as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

6. Bow Tie violates the VPPA by knowingly and intentionally disclosing consumers' PII when they purchase movie tickets on the Bow Tie Website. Specifically, when a Facebook user is logged into Facebook and purchases a movie ticket on the Bow Tie Website, Bow Tie discloses to Facebook the name of the movie title that the specific Facebook user purchased a ticket to see. Because many users stay logged into Facebook for prolonged periods of time, discovery will show that Bow Tie has transmitted PII to Facebook in violation of the VPPA on thousands of occasions.

7. The VPPA provides consumers whose privacy has been invaded with the right to recover statutory damages of $2,500 per violation, plus attorneys' fees and costs. Plaintiff brings this action to achieve redress on behalf of himself and others who were similarly injured by Defendant's unlawful conduct.

**PARTIES**

8. Plaintiff Michael Taino is a citizen and resident of New York.

9. Defendant Bow Tie Cinemas LLC is a privately owned limited liability company organized under the laws of Delaware, with principal offices in New York City.

   a. Defendant's primary offices are located at The Bow Tie Building, located at 1530 Broadway, New York, New York. (*See* https://www.linkedin.com/company/bow-tie-cinemas/about/.) That address also serves as the headquarters for a related entity,

2

        Bow Tie Partners. Defendant also has offices in Ridgefield, Connecticut. (*Id.; see also* https://tickets.bowtiecinemas.com/Browsing/Loyalty/Terms.)

    b. According to Dun & Bradstreet, Defendant Bow Tie's officers and managers include: Ben Moss, Chief Executive Officer; Jared Milgram, Executive Vice President; John Connelly, Vice President; Ike Rivera, Vice President; Rafael Silva, General Manager; Patricia Soltis, Accounting Manager; and Charles Moss III.

    c. According to his LinkedIn profile, Ben Moss is the owner of Defendant Bow Tie. (https://www.linkedin.com/in/ben-moss-04b0771aa/.)

## JURISDICTION AND VENUE

10. This Court has original federal-question and subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227, *et seq.*, and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). This action arises under the laws of the United States. Plaintiff alleges and believes that: (i) there are 100 or more class members; (ii) the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and (iii) at least one member of the plaintiff class is from a different state than the Defendant.

11. This Court has personal jurisdiction over the parties because, at all times relevant hereto, Defendant has affirmatively established and maintained sufficient contacts with New York. Defendant is registered to do business in this State, it is headquartered in this State, and it conducts significant business operations in this State.

12. Venue is proper under 28 U.S.C. § 1391 because Defendant is based in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**I.**    **THE VIDEO PRIVACY PROTECTION ACT**

13. The VPPA was passed in 1988. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie-rental store disclosed Judge Bork's rental history to the

3

Washington City Paper, which then published that history. Congress responded by passing the VPPA with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

14. The VPPA protects consumer privacy by providing for a federal cause of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710. A "video tape service provider" is defined as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*." 18 U.S.C. § 2710(a)(4) (emphasis added). The legislative history shows that "similar audio visual materials" is broad—the Senate Report noted that the term includes "laser disks, open-reel movies, or CDI technology." *See* S. Rep. No. 100-599, 100th Cong., 2d Sess., reprinted at 1988 U.S.C.C.A.N. 4342-1. This is not an exhaustive list.

15. Courts have interpreted the VPPA to apply to modern technologies and "to cover more than just the local video rental store." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017). Specifically, courts have found that "Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *In re Hulu Priv. Litig.*, No. 11-cv-03764 LB, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (citing S. Rep. No. 100-599 at 1).

16. The VPPA "codifies a context-specific extension of the *substantive* right to privacy," and it "protects generally a consumer's substantive privacy interest in his or her video-

4

viewing history." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (emphasis in original). "Accordingly, *every* disclosure of an individual's 'personally identifiable information' and video-viewing history offends the interests that the statute protects." *Id.* (emphasis in original).

17. By selling tickets to prerecorded movies, which have traditionally been shown via open-reel technology, and delivering those movies to consumers in movie theaters, Bow Tie is a "video tape service provider."

18. By purchasing movie tickets, Plaintiff and Class members are "consumers," as the VPPA defines that term. *See* 18 U.S.C. § 2710(a)(1).

19. Video tape service providers, including Bow Tie, are prohibited from knowingly disclosing, to any person, information identifying any consumers as having requested or obtained specific video materials or services. Here, that means Bow Tie cannot disclose to third parties information regarding the specific movies for which a consumer purchased tickets.

20. The VPPA's prohibition on disclosing this information extends to movie ticket purchases that are made online through Bow Tie's virtual box office. When purchasing movie tickets online, consumers make those purchases in private. The systematic disclosure of such transactions causes the exact harms that spurred Congress to pass the VPPA in the first place: the disclosure to a third party of the movies that a person has expressed a private intention to watch.

II. **BOW TIE'S KNOWING DISCLOSURE OF CONSUMERS' PII TO FACEBOOK THROUGH BOW TIE'S WEBSITE**

21. Facebook has over 2.9 billion active monthly users.[1] Facebook's Community Standards require users to use their real identities when signing up on the platform—specifically,

---

[1] https://www.reuters.com/technology/facebook-owner-meta-forecasts-q1-revenue-below-estimates-2022-02-02/.

a Facebook user may open only one account, and must use the name they use in "everyday life,"[2] including first and last name.[3] Users must also provide their birthday and gender.[4]

22. When a person signs up for Facebook, Facebook assigns them a unique Facebook ID number. The Facebook ID number is a digital address for the Facebook user and allows any ordinary person to identify the Facebook user. For example, a Google search using the word "Facebook" plus a given Facebook ID number will return the Facebook user's profile. Even more straightforward, a person can go directly to a user's Facebook profile by appending the Facebook ID to the end of "facebook.com" and typing it into the address bar of any internet browser.

23. When a user logs into Facebook using an internet browser, such as Google Chrome or Microsoft Edge, Facebook places several cookies on the user's browser.

24. A "cookie" is a piece of code placed on a browser by a server that receives information stored by the cookie. A cookie can store different types of information, but the basic function is to identify (a) the user and (b) the website the user visited that placed the cookie to begin with.

25. One of the cookies placed by Facebook on a user's browser upon login is the "c_user" cookie, which contains the user's Facebook ID number. This cookie remains on a user's browser as long as they do not hit "Log Out" when they leave Facebook. Even if the user never visits Facebook.com using that browser again, the cookie will remain on the device for one year after the user's last visit to Facebook.

26. The long life of the c_user cookie is intentional—not only does the cookie allow Facebook to identify users when they visit Facebook.com, it also allows Facebook to track the user's activity across the web on the same browser. Because the Facebook ID is specific to a person (unlike an IP address, for example), Facebook can match up a user's activity across devices using

---

[2] https://transparency.fb.com/policies/community-standards/?source=https%3A%2F%2Fwww.facebook.com%2Fcommunitystandards%2Fintegrity_authenticity
[3] Facebook.com Sign Up.
[4] *Id*.

different browsers. This enables Facebook to know, for example, that a single user is accessing the internet from a cell phone, a laptop, and a tablet. Facebook can compile a comprehensive user profile across devices and see which websites were visited on each device.[5]

27. By tracking a specific user's movements across the web and across devices, all enabled by the Facebook ID, Facebook collects enormous amounts of data regarding a user's interests, behavior, and connections.[6] The quantity and quality of this data allows Facebook to generate billions in advertising revenue—allowing businesses to target users with specific interests, target advertisements to specific users who visited their site but did not complete a purchase, and to analyze the types of Facebook users that are visiting their site by leveraging user demographics, interests, and behaviors on other websites.

28. Businesses—like Bow Tie—access these services from Facebook in part by installing the Facebook "pixel" on their website.

29. Pixels, also known as "web beacons," are small, often transparent images that an internet browser downloads like any other image on a website. When a user visits a web page that contains a Facebook pixel, the pixel is programmed to contact the Facebook ad server.

30. The business installing the pixel can program the pixel to contact Facebook when users engage in specific conduct on the business's website, such as when a user places an item in their shopping cart, clicks a certain button, or otherwise interacts with the website.[7] When the user has an active c_user cookie on their browser, and when the pixel is programmed to convey information about specific conduct (referred to as "events"), Facebook receives the event information along with the user's Facebook ID, thus connecting the specific Facebook user ID with the event-related information sent by the website.

31. If a business does not install the pixel, information about the user's actions on the website is not communicated to Facebook.

---

[5] https://www.facebook.com/business/news/cross-device-measurement.
[6] https://www.facebook.com/business/ads/ad-targeting.
[7] https://developers.facebook.com/docs/meta-pixel/advanced.

32. Businesses know that Facebook can identify the Facebook users visiting their websites. The value for the business in programming their website with the Facebook pixel is derived from Facebook's ability to identify the website visitors and link them to Facebook data on their interests, behaviors, and connections, and to allow the business to retarget advertisements to specific users. This enables businesses to, for example, target users who have purchased one product with advertisements for similar products, or companion products. One of the primary purposes for businesses who install the Facebook pixel is to enable the business to engage in remarketing campaigns, in which users who have engaged in specific behaviors on their website can be targeted with advertisements designed to encourage a subsequent behavior. For example, a consumer who placed an item in their "cart" might be targeted with remarketing ads for that item until the user completes the purchasing process.

33. At an unknown date, but at least by March 2021, Bow Tie installed the Facebook pixel on its website and on the booking page for movie ticket purchases (www.bowtiecinemas.com).

34. Bow Tie programmed the Facebook pixel to collect and transmit to Facebook certain information about the online conduct of consumers on its website.

35. Bow Tie programmed the Facebook pixel to collect and transmit to Facebook the name of the movie that the consumer is purchasing a ticket for.

36. Bow Tie also programmed the Facebook pixel to collect and transmit to Facebook the name and location of the theater where the consumer will watch the movie.

37. Bow Tie programmed its website to send this information to Facebook along with the consumer's unique Facebook ID contained in the c_user cookie. The event information and the Facebook ID are sent at the same time.

38. For example, the Bow Tie webpages to book tickets to see the movie "Venom: Let There Be Carnage" at the Movieland at Boulevard Square in Richmond, Virginia are shown below. After selecting the theater, movie, date, and time for the purchase, the customer selects the number of tickets to be purchased and the locations of the seat(s) in the theater.





Once the selections are made, the customer proceeds to check-out, confirming the selections made and completing the online purchase of the ticket(s) for the selected move.



39. When a logged-in Facebook user visits the above webpage, the following information, *inter alia*, is contemporaneously sent to Facebook (red boxes added):



40. Under the VPPA, "personally identifiable information" ("PII") is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

41. The Facebook ID, in this context, constitutes PII under the VPPA. *See Lebakken v. WEBMD, LLC*, No. 22-cv-644 (TWT), 2022 WL 16716151, at *4 (N.D. Ga. Nov. 4, 2022) (denying motion to dismiss and holding that alleged disclosure of plaintiff's "Facebook ID and email address in connection with her video viewing information to Facebook . . . constituted a disclosure of PII, supporting a plausible claim under the VPPA"); *Stark v. Patreon, Inc.,* No. 22-cv-03131 (JCS), 2022 WL 7652166, at *7-8 (N.D. Cal. Oct. 13, 2022) (holding that Facebook ID qualified as PII under the VPPA under Ninth Circuit precedent and granting motion to dismiss on other grounds not applicable here).

42. As shown above, the information that Bow Tie knowingly chooses to provide to Facebook, in a single transmission, permits an ordinary person to identify a consumer as having requested movie tickets for a specific movie from Bow Tie.

43. Bow Tie has programmed its website to take advantage of the fact that Facebook knows who its users are as they browse the web. Bow Tie informs Facebook which movies a Facebook user has purchased tickets for while knowing that the information is linked to a specific consumer and that the information provided is sufficient to "identify a person as having requested or obtained specific video materials or services from a video tape service provider."

44. By systematically sending this information to Facebook, Bow Tie violates consumers' right to privacy in their video-viewing history and their interests in retaining control over their personal information.

### III. BOW TIE SHARED INFORMATION WITH FACEBOOK REGARDING THE NAME OF THE MOVIES PLAINTIFF PURCHASED TICKETS FOR ON BOW TIE'S WEBSITE

45. Plaintiff Michael Taino has had a Facebook account since at least 2007.

11

46. Plaintiff Taino accessed the Bow Tie Website and purchased a movie ticket on June 27, 2021.

47. Plaintiff Taino was logged into his Facebook account on the same device used to access the Bow Tie Website.

48. When Plaintiff Taino purchased movie tickets on the Bow Tie Website on June 27, 2021, Bow Tie shared with Facebook the name of the movie for which Plaintiff purchased a ticket, along with Plaintiff's Facebook ID.

49. At all times relevant, Plaintiff Taino never consented, agreed, or otherwise permitted Defendant to disclose his PII in connection with his purchases of movie tickets on the Bow Tie Website.

50. Nevertheless, Bow Tie knowingly disclosed Plaintiff's PII to Facebook when he purchased a movie ticket on the Bow Tie Website.

51. By disclosing this information to Facebook, Bow Tie violated Plaintiff Taino's right to privacy in his video-viewing history and his interest in retaining control over his personal information.

52. Plaintiff Taino has not purchased movie tickets on the Bow Tie Website since learning of Bow Tie's conduct. Plaintiff still desires to use this service and would purchase movie tickets on the Bow Tie Website again if Plaintiff knew that Bow Tie would not share his video viewing information with third parties.

**CLASS ALLEGATIONS**

53. Plaintiff brings claims on behalf of himself, individually, and on behalf of a class consisting of all Facebook users in the United States (i) who purchased one or more movie tickets on the Bow Tie Website and (ii) for whom Bow Tie later disclosed to Facebook, within the statute of limitations, the name of the movie(s) for which the user had purchased ticket(s) (the "Class").

54. Numerosity: Members of the Class are so numerous that joinder of all Class members is impracticable. Given the volume of Defendant's business, there are thousands of Class members.

55. Commonality: This case presents common questions of law and fact, including but not limited to:

    a. Whether Bow Tie is a "video tape service provider" under the VPPA;

    b. Whether Bow Tie knowingly installed the Facebook pixel on its website and programmed it to collect information, including the movie title, when consumers purchased tickets;

    c. Whether Bow Tie disclosed Class members' PII; and

    d. Whether the transmissions at issue permit an ordinary person to identify a person as having requested or obtained specific video materials or services from a video tape service provider.

56. Typicality: Plaintiff's claims are typical of the members of the Class. Plaintiff and all members of the Class visited the same website, programmed in the same way by Bow Tie, and had the same information sent to Facebook.

57. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class because Plaintiff and his experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

58. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the VPPA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover, management of this action as a class action will not present any likely

difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

59. Class certification is also appropriate for equitable or injunctive relief because Defendant has acted or refused to act on grounds that apply generally to the Class such that final injunctive relief is appropriate respecting the Class as a whole.

60. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual Class members are insufficient in amount to support separate actions.

61. Yet, the amount which may be recovered by individual Class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## COUNT I
## VIOLATION OF THE VPPA,
## 18 U.S.C. § 2710, *et seq.*

62. Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

63. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

64. Defendant is a "video tape service provider" because it sells movie tickets to consumers on the Bow Tie Website and delivers pre-recorded movies to consumers in movie theaters, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

65. Plaintiff and the Class are "consumers" because they purchased movie tickets on the Bow Tie Website. 18 U.S.C. § 2710(a)(1).

66. Defendant disclosed to Facebook the PII of Plaintiff and members of the Class. For each Class member, Defendant transmitted the Class member's Facebook ID and the name of the movie they were purchasing tickets for, in a single transmission, to Facebook. This information sufficiently permits an ordinary person to identify a specific individual's video viewing behavior.

67. Defendant transmitted this PII knowingly. It installed the Facebook pixel on its website, including the movie ticket booking page, and it determined which information it wanted to share with Facebook. Defendant knew that Facebook would identify a substantial number of the consumers who visited the Bow Tie Website, and Defendant transmitted the information regarding which movies consumers purchased tickets for anyway.

68. Plaintiff and members of the Class did not provide Defendant with any form of consent—either written or otherwise—allowing it to disclose their PII to third parties.

69. On behalf of himself and the Class, Plaintiff seeks, pursuant to 18 U.S.C. § 2710(c): (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA; (iv) punitive damages; and (v) reasonable attorneys' fees and costs and other litigation expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class, seeks the following relief:

A. Determining that this action may proceed as a class action;

B. Designating Plaintiff as the class representative for the Class;

C. Designating Plaintiff's counsel as counsel for the Class;

D. Issuing proper notice to the Class at Defendant's expense;

E. Declaring that Defendant violated the VPPA;

F. Awarding actual and/or statutory damages as provided by the VPPA;

G. Awarding punitive damages;

  H.  Granting appropriate injunctive relief;

  I.  Awarding reasonable attorneys' fees and costs and expenses; and

  J.  Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, demand a trial by jury on all issues triable by a jury.

Dated: June 23, 2023      Respectfully submitted,

                                _____
                                Zachary M. Vaughan (NY Bar # 4993283)
                                BERGER MONTAGUE PC
                                2001 Pennsylvania Ave. NW, Suite 300
                                Washington, DC 20006
                                Tel.: (215) 875-4602
                                zvaughan@bm.net

                                Sherrie R. Savett*
                                Lane L. Vines*
                                BERGER MONTAGUE PC
                                1818 Market Street, Suite 3600
                                Philadelphia, PA 19103
                                Tel.: (215) 875-3000
                                ssavett@bm.net
                                lvines@bm.net

                                Sophia M. Rios*
                                BERGER MONTAGUE PC
                                401 B Street, Suite 2000
                                San Diego, CA 92101
                                Tel: (619) 489-0300
                                srios@bm.net

                                * *Pro hac vice* motion to be filed

                                *Attorneys for Plaintiff*
                                *and the proposed Class*