## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MICHAEL TAINO, individually and on behalf of those similarly situated,<br><br>                                 Plaintiff,<br><br>v.<br><br>BOW TIE CINEMAS, LLC<br><br>                                 Defendant. | Civil Action No. 1:23-cv-05371-VSB<br><br><br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BOW TIE CINEMAS, LLC'S MOTION TO DISMISS THE COMPLAINT

**McCARTER & ENGLISH, LLP**
Christopher A. Rojao
Edward J. Fanning, Jr.
Worldwide Plaza
825 Eighth Ave., 31st Floor
New York, NY 10019
Telephone: (212) 609-6800
Facsimile: (212) 609-6921
crojao@mccarter.com
efanning@mccarter.com

*Attorneys for Defendant,*
*Bow Tie Cinemas, LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................1

STATEMENT OF FACTS ...................................................................................3

ARGUMENT .......................................................................................................4

  I.  LEGAL STANDARD & THE VIDEO PROTECTION PRIVACY ACT ...................................................................................4

  II.  THE SALE OF MOVIE TICKETS TO ATTEND A SHOWING AT A PUBLIC THEATER DOES NOT RENDER BTC A "VIDEO TAPE SERVICE PROVIDER" ..............................................6

  III.  THE DISCLOSURE OF NUMBERS ASSOCIATED WITH A C_USER COOKIE DOES NOT CONSTITUTE PERSONALLY IDENTIFIABLE INFORMATION .........................14

CONCLUSION ..................................................................................................17

ME1 45902381v.1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Almendarez-Torres v. U.S.*,
    523 U.S. 224 (1998)........................................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)....................................................................................4, 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................5, 16

*Carter v. Scripps Networks, LLC*,
    -- F. Supp. 3d --, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ........................5

*Delaware v. Pennsylvania*,
    598 U.S. 115 (2023)........................................................................................7

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ........................................................................10

*El Omari v. Int'l Crim. Police Org.*,
    35 F.4th 83 (2d Cir. 2022) ..............................................................................7

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) ...............................................................6, 11

*Golden v. NBCUniversal Media, LLC*,
    No. 22-cv-9859, 2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) ......................16

*In re Hulu Privacy Litig.*,
    No. 11-cv-3764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)......................12

*Kennedy Theater Ticket Serv. v. Ticketron, Inc.*,
    342 F. Supp. 922 (E.D. Pa. 1972).....................................................................9

*Louth v. NFL Enters. LLC*,
    No. 21-cv-405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022) ..............................12

*Martin v. Meredith Corp.*,
    -- F. Supp. 3d --, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023)....................5, 6

ME1 45902381v.1

*McDonnell v. United States*,
579 U.S. 550 (2016)..................................................................................8

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......................................10, 11, 15, 16

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ...............................................15

*Simms v. Deggeller Attractions, Inc.*,
No. 12-cv-38, 2012 WL 1108779 (W.D. Va. Mar. 30, 2012)............................9

*Spadaro v. United States Customs & Border Prot.*,
978 F.3d 34 (2d Cir. 2020) ...............................................................7

*Stark v. Patreon, Inc.*,
635 F. Supp. 3d 841 (N.D. Cal. 2022).............................................10

*SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*,
578 F. Supp. 3d 511 (S.D.N.Y. 2022) ...............................................5

*TRW Inc. v. Andrews*,
534 U.S. 19 (2001)............................................................................7

*Walker v. Meta Platforms, Inc.*,
No. 22-cv-2442, 2023 WL 3607282 (N.D. Cal. Mar. 3, 2023)............................8

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022) ................................................15

**Federal Statutes**

17 U.S.C. § 101 ................................................................................10

18 U.S.C. § 2710(a)(3)..................................................................*passim*

42 U.S.C. § 12181 ...........................................................................10

**Other Authorities**

58 Cong. Rec. H6849-01, H6850......................................................13

158 Cong. Rec. S8320-03 ................................................................13

ME1 45902381v.1

S. Rep. No. 100-599...........................................................................................12, 13

iv

## PRELIMINARY STATEMENT

Defendant Bow Tie Cinemas, LLC ("Bow Tie"), one of North America's oldest movie theater chains and a fourth-generation, family-owned business, is the latest target in a wave of lawsuits under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Congress enacted the VPPA to prevent the disclosure of "personally identifiable information" about video-viewing habits by "video tape service providers," which are defined as persons "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). The impetus for this legislation was the disclosure of Supreme Court nominee Judge Bork's video store rental history during his confirmation process. This lawsuit, like others, seeks to apply the statute to vastly different circumstances from those in which it was enacted in order to take advantage of the Act's $2,500 statutory damages provision in a class action setting. This Court should dismiss the Complaint for two reasons.

First, movie tickets purchased online to view a film at a public movie theater—the alleged disclosure at issue here—are not "prerecorded video cassette tapes or similar audio visual materials." Pursuant to basic principles of statutory interpretation, Congress did not intend the VPPA to extend beyond the limited purpose for which it was enacted: to prevent prying into individual's private video rental history within their home or on their personal electronic device. This Court

1

should decline Plaintiff's attempt to stretch the VPPA's scope to cover circumstances that existed at the time of its enactment; to wit, purchases of movie tickets to attend a movie with friends and strangers in a public place.

Second, the disclosure of the allegedly personally identifiable information ("PII") at issue in this case does not fall within the scope of the statute. The disclosure of PII at issue was the result of third-party tracking tools originating from Facebook. Plaintiff alleges that Facebook's installation of a "c_user" cookie on his internet browser (an information-storing piece of code used to identify websites visited by a holder), in conjunction with Bow Tie's installation of a Facebook "pixel" on its website (a programmable beacon installed on a website that transmits information to Facebook's ad server), caused the disclosure of a string of numbers to Facebook when Plaintiff proceeded through the check-out process for a movie ticket purchase. This string of numbers is tied to the c_user cookie and allegedly corresponds to Plaintiff's "Facebook ID." Assuming that the purchase of online movie tickets falls within the scope of the VPPA, the disclosure of this string of numbers tied to a c_user cookie does not readily permit an ordinary person to identify Plaintiff's specific video-viewing habits.

For these reasons, this Court should dismiss Plaintiff's Complaint.[1]

---

[1] Bow Tie has also moved to compel arbitration and stay proceedings pending the outcome of the arbitration. Bow Tie respectfully requests the Court rule on its Motion to Compel Arbitration before resolving this Motion to Dismiss.

ME1 45902381v.1

## STATEMENT OF FACTS

Plaintiff alleges that he visited Bow Tie's website, www.bowtiecinemas.com, to purchase a movie ticket on or about June 27, 2021. Compl. ¶¶ 3, 46. Plaintiff claims that he was logged into his Facebook account on the same device that he used to access Bow Tie's website. *Id.* ¶ 47. Plaintiff further alleges that Facebook placed a "c_user" cookie on his browser that contained his Facebook ID number, which is a digital identification number. *See id.* ¶¶ 22-25. According to the Complaint, this c_user cookie allows Facebook "to track the user's activity across the web on the same browser." *Id.* ¶ 26. Plaintiff alleges that Facebook uses this data to, among other things, "allow[] businesses to target users with specific interests, [and] target advertisements to specific users who visited their site but did not complete a purchase . . . ." *Id.* ¶ 27.

Plaintiff alleges that Bow Tie installed a Facebook pixel on its website in or before March 2021. *Id.* ¶ 33. According to the Complaint, "[w]hen a user visits a web page that contains a Facebook pixel, the pixel is programmed to contact the Facebook ad server." *Id.* ¶ 29. Plaintiff avers that "Bow Tie programmed the Facebook pixel to collect and transmit to Facebook the name of the movie that the consumer is purchasing a ticket for," *id.* ¶ 35, "along with the consumer's unique Facebook ID contained in the c_user cookie," *id.* ¶ 38. To demonstrate what information is sent, Plaintiff included the following screenshot in his Complaint:

3

*Id.* ¶ 39. The redacted box next to "c_user" purports to contain a user's Facebook ID,

which Plaintiff asserts constitutes PII in this lawsuit. *Id.* ¶ 41. He contends that he

"never consented, agreed, or otherwise permitted [Bow Tie] to disclose his PII in

connection with his purchases of movie tickets on the Bow Tie Website." *Id.* ¶ 49.

## ARGUMENT

## I.    LEGAL STANDARD & THE VIDEO PROTECTION PRIVACY ACT

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim,

"a complaint must contain sufficient factual matter, accepted as true, 'to state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Courts should "tak[e] care to require allegations that reach the level" of plausibility prior to exposing defendants to "the potentially enormous expense of discovery." *Twombly*, 550 U.S. at 559. Thus, "'at the outset of a lawsuit,' a plaintiff ordinarily must plead 'what the plaintiff must prove in the trial at its end.'" *SUEZ Water New York Inc. v. E.I. du Pont de Nemours & Co.*, 578 F. Supp. 3d 511, 538 (S.D.N.Y. 2022) (quoting *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021)).

"The VPPA was enacted after 'the publication in a weekly newspaper in Washington of a profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store.'" *Carter v. Scripps Networks, LLC*, -- F. Supp. 3d --, 2023 WL 3061858, at *4 (S.D.N.Y. Apr. 24, 2023) (quoting *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015)). The statute "creates a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits." *Martin v. Meredith Corp.*, -- F. Supp. 3d --, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016)); *see also* 18 U.S.C. § 2710(b)(1). "Senator Patrick Leahy explained that the new law was meant to protect 'our right to privacy [in] the choice of movies that we watch with our family in our own homes,' as

'[t]hese activities are at the core of any definition of personhood.'" *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015) (quoting 134 Cong. Rec. S5397–01 (1988)).

The VPPA provides that "[a] video tape service provider who knowingly discloses, to any person, [PII] concerning any consumer of such provider shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1). Thus, to state a claim under the VPPA, Plaintiff must allege facts that plausibly establish: "(1) a defendant is a 'video tape service provider,' (2) the defendant disclosed '[PII] concerning any consumer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by another part of the statute." *Martin*, 2023 WL 2118074, at *3 (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)). Plaintiff fails to plead the first and second *prima facie* elements of his VPPA claim.

## II. THE SALE OF MOVIE TICKETS TO ATTEND A SHOWING AT A PUBLIC THEATER DOES NOT RENDER BTC A "VIDEO TAPE SERVICE PROVIDER"

Well-settled principles of statutory interpretation make clear that Bow Tie's sale of movie tickets to view films in its public theaters does not render Bow Tie a "video tape service provider" within the meaning of the statute. The VPPA defines the term "video tape service provider" as "any person[] engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). For the reasons that follow, a movie ticket is not

a "similar audio visual material" to a "prerecorded video cassette tape." 18 U.S.C. §
2710(a)(4).

"Statutory construction must begin with the language employed by Congress
and the assumption that the ordinary meaning of that language accurately expresses
the legislative purpose." *El Omari v. Int'l Crim. Police Org.*, 35 F.4th 83, 88 (2d Cir.
2022) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009)). The Court
must give meaning to every word of the statute. *See TRW Inc. v. Andrews*, 534 U.S.
19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought,
upon the whole, to be so construed that, if it can be prevented, no . . . word shall be
superfluous, void, or insignificant."). When the meaning of a term or phrase is
unclear, courts make use of "a variety of interpretive tools, including canons,
statutory structure, and legislative history." *Spadaro v. United States Customs &
Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020) (quoting *United States v. Lockhart*, 749
F.3d 148, 152 (2d Cir. 2014)).

Congress's use of the word "similar" clarifies the VPPA's scope. The word
"similar" is generally defined as "having characteristics in common," and "alike in
substance or essentials." Webster's Third New Int'l Dictionary (1986). This Court
must "determine what 'similar' entails in light of the [VPPA's] 'text and content,'
and not in the abstract." *Delaware v. Pennsylvania*, 598 U.S. 115, 127 (2023)
(quoting *Southwest Airlines Co. v. Saxon*, 142 S.Ct. 1783, 1790 (2022).

The term "similar" relates back to the term "pre-recorded video cassette tapes." 18 U.S.C. § 2710(a)(4). Thus, any "audio visual material" must have characteristics in common with "prerecorded video cassette tapes." *See Walker v. Meta Platforms, Inc.*, No. 22-cv-2442, 2023 WL 3607282, at *6 (N.D. Cal. Mar. 3, 2023) (holding that "'similar audio visual materials' must be read in a manner that gives meaning to, and that does not render superfluous, the word 'prerecorded' in the preceding phrase"); *cf. McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) (explaining that the "interpretative canon *noscitur a sociis*, 'a word is known by the company it keeps,'" is often "'applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961))).

Movie tickets to attend a showing at one's local cinema are not "audio visual materials" that are "similar" to "prerecorded video cassette tapes." There are two key characteristics of a "prerecorded video cassette tape" that must be shared by the "audio visual material" at issue in order for it to be "similar," and consequently, within the scope of the VPPA.

First, the "material" at issue must contain, or be, a prerecorded audio visual work that can be viewed privately. Unlike a physical video tape, DVD, or video file capable of being streamed over the internet, a movie ticket does not have any audio visual component. Instead, it is a ***license*** to attend a showing at a public theater with

8

friends, strangers, and other consumers. *See Simms v. Deggeller Attractions, Inc.*, No. 12-cv-38, 2012 WL 1108779, at *2 (W.D. Va. Mar. 30, 2012) ("[T]he purchase of a theatre ticket gives rise to an implied contract that grants the patron a revocable license to use the premises."); *Kennedy Theater Ticket Serv. v. Ticketron, Inc.*, 342 F. Supp. 922, 925 (E.D. Pa. 1972) ("Admission tickets have been uniformly defined as revocable licenses issued as convenient evidence of the right of the holder to be admitted to a particular place of entertainment at a specific time and date for the privilege of being entertained.").

Other statutory definitions make clear that the VPPA concerns private consumption of audio visual materials—not purchased movie tickets to attend a film at a public theater. The VPPA provides a cause of action for the knowing disclosure of PII, which is defined as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(3). But, by purchasing a ticket to attend a live event or a prerecorded movie at a public theater, a person identifies him or herself as having requested the video material or service at issue.

The words chosen by Congress in the statute's titles also matter. *See Almendarez-Torres v. U.S.*, 523 U.S. 224, 234 (1998). Movie theaters existed in 1988. Nonetheless, Congress sought to regulate the "[w]rongful disclosure of ***video tape*** rental or sale records." 18 U.S.C. § 2710 (title of statute) (emphasis added); *see*

ME1 45902381v.1

*also id.* § 2710(b) (titled "Video tape rental and sale records"). If Congress sought to regulate the disclosure of "movie ticket sales records," it would have chosen broader language.[2]

As other courts have done in rejecting attempts to impermissibly stretch the VPPA's scope, this Court should hold that Congress did not "intend[] for the law to cover factual circumstances far removed from those that motivated its passage"; to wit, the purchase of movie tickets. *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 284; *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (adopting interpretation of PII that "fits most neatly with the regime that the VPPA's enacting Congress likely had in mind" and declining to read statute "to cover circumstances so different from the ones that motivated its passage"); *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 851 (N.D. Cal. 2022) (holding that the VPPA does not cover live broadcasts because "while broadcast, cable, and satellite television were all well established at the time of the VPPA's passage, there is

---

[2] When Congress has elected to include movie theaters within the scope of a particular statute, it has proven more than capable of enacting legislation to that effect. For example, the Americans with Disabilities Act covers "motion picture houses," 42 U.S.C. § 12181(7)(C), and the Copyright Act speaks to a "motion picture exhibition facility," 17 U.S.C. § 101. Not only that, both these definitions expressly refer to the public nature of movie theaters. *See* 42 U.S.C. § 12181 (defining motion picture houses as a "public accommodation"); 17 U.S.C. § 101 (describing a "movie theater, screening room, or other venue" that exhibits a motion picture, "if such exhibition is open to the public or is made to an assembled group of viewers outside of a normal circle of a family and its social acquaintances").

10

nothing in the statute's language suggesting that providers of such live broadcasts fall within its scope").

Turning to the second common characteristic that is necessary for an "audio visual material" to be similar to a prerecorded video cassette tape, the "audio visual material" must be a physical or electronic thing that can be the subject of a "rental, sale, or delivery" for consumption in a consumer's home or on a personal device. The impetus behind the VPPA was the ability to view a "video cassette tape" or "similar audio visual material" within the privacy of one's home or on a personal electronic device without disclosure of the viewer's personal video-watching habits to the public at large. *See Ellis*, 803 F.3d at 1253; *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 278. The purchase of a movie ticket to see a film at the local theater is a far cry from the privacy interest that Congress sought to protect.

An interpretation of the 18 U.S.C. § 2710(a)(4) that requires the "similar audio visual material[]" to be the subject of a "rental, sale, or delivery" comports with Congress's intent to capture transactions made at video rental stores, as well as transactions made through emerging technologies such as the then-budding internet age. Today, Amazon, Apple, and other service providers complete sales and rentals of audio visual materials directly on one's television or computer. In addition, streaming services such as Netflix are engaged in the "delivery" of "audio visual materials" to subscribers by transmitting the relevant video files to televisions,

11

computers, and mobile devices via the internet. Purchases of movie tickets, whether at the box office or online, are simply licenses to attend a public event; they do not capture one's video-watching habits in the same manner as Blockbuster or Netflix.

Bow Tie anticipates that Plaintiff will attempt to rely on a one-off reference to "open-reel movies" in the VPPA's legislative history. Specifically, the 1988 Senate Report recommending passage of the VPPA identifies examples of materials that fall within the scope of "similar audio visual materials": "laser discs, open-reel movies, and CDI technologies." S. Rep. No. 100-599 at 5. As past courts have persuasively concluded, "[t]his Report 'suggests Congress' intent to cover new technologies for pre-recorded video content.'" *Louth v. NFL Enters. LLC*, No. 21-cv-405, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (quoting *In re Hulu Privacy Litig.*, No. 11-cv-3764, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012)). By including this illustrative list, Congress simply sought "to ensure that [the VPPA's] protections would retain their force even as technologies evolve." *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6. Congress did not intend to sweep the then-existing movie theater business into the VPPA by way of this isolated illustration in its legislative history.

Indeed, the remainder of the VPPA's legislative history confirms Congress's intent and scope. Congress was not attempting to create a private right of action related to the public act of going to a movie theater or purchasing movie tickets.

Instead, Congress was focused on the technologies that consumers used for entertainment in the privacy of their homes. *See* S. Rep. No. 100-599 at 5 ("It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home." (Sen. Leahy)). Congress amended the VPPA in 2012 to account for emerging technologies. Comments on the amendment by its sponsors make clear that the VPPA's focus has always been on the privacy interests within one home, and now, on the internet. *See* 158 Cong. Rec. S8320-03, S8321 ("The bill we enact today takes several important steps to accommodate new technologies, like video streaming and social networking, while also helping to protect digital privacy rights in cyberspace. . . . [T]he bill updates the [VPPA] to keep pace with how most Americans view and share videos today-on the Internet." (Sen. Leahy)); 158 Cong. Rec. H6849-01, H6850 ("The commercial video distribution landscape has changed dramatically since 1988. Back then, the primary consumer consumption of commercial video content occurred through the sale or rental of prerecorded videocassette tapes. This required users to travel to their local video rental store to pick a movie. Afterward, consumers had to travel back to the store to return the rented movie. Movies that consumers rented and enjoyed were recommended to friends, primarily through face-to-face conversations." (Rep. Goodlatte)).

ME1 45902381v.1

Although the Complaint is replete with case law interpreting the VPPA, Plaintiff cites no cases applying the VPPA to movie ticket sales. Selling tickets that grant the consumer a license to attend theatrical movie screening at a theater differs from renting, selling or delivering recordings of the movies themselves. Accordingly, this Court should dismiss the Complaint because Plaintiff fails plausibly to allege that Bow Tie is a "video tape service provider" within the meaning of the VPPA.

## III.  THE DISCLOSURE OF NUMBERS ASSOCIATED WITH A C_USER COOKIE DOES NOT CONSTITUTE PERSONALLY IDENTIFIABLE INFORMATION

The VPPA states that PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(3). At issue here is the alleged transmission of the numbers associated with a Facebook ID through the c_user cookie installed on that person's browser:



See Compl. ¶ 39. That redacted string of numbers does not constitute PII within the meaning of the VPPA.

This Court has cautioned against an overly broad reading of PII, observing that "[i]f nearly any piece of information can, with enough effort on behalf of the

recipient, be combined with other information so as to identify a person, then the scope of PII would be limitless." *Robinson*, 152 F. Supp. 3d at 181. Thus, this Court has held that "PII only refers to 'the kind of information that would readily permit an *ordinary person* to identify a specific individual's video-watching behavior.'" *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 282-83) (emphasis added). This approach "does not make the scope of PII dependent on the specifics of the recipient of the disclosure." *Id.* (citing *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 290). Rather, what matters is whether the content itself plausibly permits the inference that an ordinary person would be able to identify Plaintiff and his video-viewing habits.

Plaintiff states no facts to substantiate his conclusory allegation that "[t]his information sufficiently permits an ordinary person to identify a specific individual's video-viewing behavior." Compl. ¶ 66. To an ordinary recipient, "a digital code in a cookie file would likely be of little help in trying to identify an actual person." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 283. Based on the image in the complaint, the c_user cookie is not called out as a "Facebook ID." *See* Compl. ¶ 39. Instead, the c_user cookie, to the ordinary recipient, appears to be a few characters within a larger string of code with no discernable significance or meaning. Even assuming the ordinary recipient would recognize the c_user cookie as a Facebook

ME1 45902381v.1

ID, they would have to know what a Facebook ID is and how to use that information to find the associated Facebook profile. Then, the recipient would need to engage in extra effort in order to discover the Facebook profile associated with that number by searching for the associated profile on Facebook.

This required string of actions necessary to be taken by an ordinary recipient of this information is "simply too far afield from the circumstances that motivated the Act's passage to trigger liability": "a video clerk leaking an individual customer's video rental history."[3] *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d at 290. Accordingly, Plaintiff's attenuated theory fails to "nudge[] [his] claim[] across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

---

[3] Bow Tie acknowledges that some courts have concluded that a Facebook ID may constitute PII. *See, e.g.*, *Golden v. NBCUniversal Media, LLC*, No. 22-cv-9859, 2023 WL 5434378, at *5-6 (S.D.N.Y. Aug. 23, 2023). However, the Second Circuit has not resolved this issue. Furthermore, the issue is whether Plaintiff has adequately pleaded that an ordinary recipient of the string of numbers associated with a c_user cookie would know that it is a Facebook ID or PII. Plaintiff has failed to do so.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant respectfully requests this Court grant this Motion to Dismiss, and dismiss the Complaint with prejudice.

Dated: September 25, 2023

**MCCARTER & ENGLISH, LLP**

*/s/ Christopher A. Rojao*

Christopher A. Rojao
Edward J. Fanning, Jr.
Worldwide Plaza
825 Eighth Ave., 31st Floor
New York, NY 10019
Telephone: (212) 609-6800
Facsimile: (212) 609-6921
efanning@mccarter.com
crojao@mccarter.com

*Attorneys for Defendant,*
*Bow Tie Cinemas, LLC*

ME1 45902381v.1